**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ROBBIN JOHNSON, MICHAEL GULOTTA, and SARA LUNDBORG, individually and as representatives of a class of participants and beneficiaries on behalf of the ABBOTT LABORATORIES HEALTH CARE PLAN, | Civil Action No. 1:26-cv-8304 |
| *Plaintiffs*, | **CLASS ACTION COMPLAINT**  JURY TRIAL DEMANDED |
| v. | |
| ABBOTT LABORATORIES, | |
| *Defendant*. | |

**NATURE OF THE ACTION**

1. Plaintiffs Robbin Johnson, Michael Gulotta, and Sara Lundborg ("Plaintiffs"), as representatives of the putative class, and on behalf of the Abbott Laboratories Health Care Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1104 and 1106, and pursuant to ERISA's civil enforcement provision, 29 U.S.C. § 1132(a)(2) and (a)(3), against defendant Abbott Laboratories ("Abbott" or "Defendant").

2. This is a case about excessive healthcare costs charged to Plaintiffs and other Plan participants. Defendant offered two health insurance options to Plan participants that provided the *same* medical coverage. One health insurance option, the Traditional PPO, cost participants more. The other option, the HIP PPO, cost participants less. Defendant knew, or should have known, that participants who chose the more expensive option (i.e., the Traditional PPO) would virtually *always* pay more for the same covered medical treatment – yet Defendant continued to offer that more expensive health insurance option to Plan participants for years.

1

3. Although this action is brought derivatively on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Defendant's fiduciary breaches also caused substantial financial harm to the Plan's participants and beneficiaries. By maintaining an imprudent and unnecessarily costly health insurance option, Defendant caused the Plan to incur excessive costs while requiring participants to pay higher amounts than they otherwise would have paid. Accordingly, Plaintiffs seek to recover losses to the Plan and obtain appropriate equitable relief for the benefit of the Plan and its participants and beneficiaries.

4. Defendant, as the Plan's fiduciary, was responsible for selecting and monitoring the Plan's health insurance offerings and ensuring that participants were presented only with prudent options.

5. During the class period, Defendant offered three health insurance options: (1) the Traditional PPO, a Preferred Provider Organization ("PPO") option that required participants to pay relatively high payroll contributions and had a relatively low deductible; (2) the Health Investment Plan PPO (the "HIP PPO"), an option under which participants paid relatively low payroll contributions, had a relatively high deductible, and were eligible to receive employer contributions through a Health Savings Account ("HSA") to help offset healthcare expenses[1]; and (3) the Surest option, which offered different coverage than the Traditional PPO and the HIP PPO, and thus is not at issue.

6. The Traditional PPO was more expensive than the HIP PPO *regardless* of a participant's healthcare spending, without delivering any additional benefit. Accordingly, a

---

[1] Employer contributions are available only to participants who, after enrolling in the HIP PPO, open a Health Savings Account ("HSA"). Opening an HSA requires compliance with the customer identification procedures required by the Patriot Act, 31 U.S.C. § 5318(l), and its implementing regulations. As a result, some participants enrolled in the HIP PPO may not have opened an HSA and therefore may not receive employer contributions.

prudent fiduciary acting solely in participants' best interests would not have offered the Traditional PPO when the HIP PPO was also available.

7. Defendant knew or should have known that the Traditional PPO was more expensive than the HIP PPO, yet failed to act.

8. Defendant's acts and omissions have caused millions of dollars in losses to the proposed class. Plaintiffs bring this action to recover losses to the Plan, obtain appropriate equitable and injunctive relief, prevent similar conduct, and enforce Defendant's obligations under ERISA, 29 U.S.C. § 1132(a)(2) and (a)(3).

## THE PARTIES

### A. Plaintiffs

9. Plaintiff Robbin Johnson resides in Round Lake Beach, Illinois. Plaintiff Johnson participated in the Plan from approximately 2020 to September 2025, and was a participant in the Plan with the "Employee-Only" tier of coverage.

10. During Ms. Johnson's time in the Plan, she was enrolled in coverage through the Traditional PPO option.

11. Ms. Johnson has been financially injured by Defendant's unlawful conduct. As a result of Defendant's ERISA violations, she paid more in healthcare costs than she would have paid had Defendant prudently removed the Traditional PPO.

12. Plaintiff Michael Gulotta resides in Round Lake Heights, Illinois. Plaintiff Gulotta participated in the Plan from approximately 2001 through the present and is a current participant in the Plan with the "Family" tier of coverage.

13. During Mr. Gulotta's time in the Plan, he has been enrolled in coverage through the Traditional PPO for almost the entire duration of his employment with Defendant.

3

14.     Mr. Gulotta has been financially injured by Defendant's unlawful conduct. As a result of Defendant's ERISA violations, he paid more in healthcare costs than he would have paid had Defendant prudently removed the Traditional PPO.

15.     Plaintiff Sara Lundborg is Mr. Gulotta's domestic partner and is also currently enrolled in the Traditional PPO through Mr. Gulotta's selection.

16.     As a beneficiary covered by Mr. Gulotta's enrollment in the Traditional PPO who also used covered services and treatments, Ms. Lundborg incurred higher healthcare costs than she would have incurred under the HIP PPO.

17.     Plaintiff Lundborg formerly worked for Defendant.

## B.     Defendant Abbott

18.     Defendant is a corporation headquartered in Abbott Park, Illinois; its primary business is developing, manufacturing, and selling medical and health-related products, such as chronic pain therapies or diabetes management monitoring devices.[2]

19.     Defendant maintains an employee welfare benefit plan within the meaning of ERISA, 29 U.S.C. § 1002(1).[3]

20.     Defendant is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B).[4]

21.     Defendant is also identified in the governing Plan documents as the Plan Administrator and as a named fiduciary responsible for the operation and administration of the Plan.[5]

---

[2] *Products and Solutions*, ABBOTT LABS., available at https://www.abbott.com/en-us/products-solutions, archived at https://perma.cc/M7XZ-8FMH.

[3] Abbott Laboratories Health Care Plan, Plan Document and Summary Plan Description, at 1 (effective Jan. 1, 2024), available at https://cache.hacontent.com/ybr/R516/00472_ybr_ybrfndt/downloads/BCBSActiveSPD.pdf, archived at https://perma.cc/HD38-LHM8.

[4] *Id.*

[5] *Id.*

22.     The Plan is administered through Defendant's Corporate Benefits Department, including its Divisional Vice President of Compensation and Benefits, who exercises discretionary authority and control over Plan administration.[6]

23.     Claims administration is delegated to third-party processors, including Blue Cross Blue Shield of Illinois for medical claims and Express Scripts for prescription drug benefits.[7]

24.     Defendant, acting through these individuals and departments, exercises discretionary authority and/or control regarding the administration of the Plan and is therefore a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A).[8]

25.     To the extent Defendant has delegated fiduciary responsibilities to other persons or entities, including claims administrators and service providers, such persons or entities are fiduciaries to the extent they exercise discretionary authority or control over Plan management or administration within the meaning of 29 U.S.C. §§ 1002(21)(A) and 1105(c). Each such delegated fiduciary acts on behalf of Defendant and the Plan with respect to the functions assigned to it.

## JURISDICTION AND VENUE

26.     **Subject-matter jurisdiction**. This case presents a federal question under ERISA, and therefore the Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

27.     **Venue**. Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendant may be found.

---

[6] *Id.*
[7] *Id.* at 3.
[8] *Id.* at 1–4.

28.     **Standing**. Plaintiffs bring this action pursuant to 29 U.S.C. §§ 1132(a)(2) and (a)(3), which provide that participants in an employer-sponsored health insurance plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

29.     Plaintiffs also have standing because they personally incurred excessive costs for healthcare coverage. Had Defendant acted prudently and removed the more expensive Traditional PPO option, Plaintiffs would have paid less for equivalent healthcare coverage. Plaintiffs therefore suffered a concrete financial injury that is fairly traceable to Defendant's conduct and redressable through the relief sought in this action.

## BACKGROUND

### I.     The Economic Significance of Employer-Sponsored Health Plans

30.     Employer-sponsored health coverage is the primary way working Americans obtain access to medical care. As of 2023, more than 100 million individuals (representing a majority of the non-elderly population) received health insurance through employer-sponsored health plans.[9]

31.     Employers are the "principal source of health insurance in the United States, providing health benefits for 154 million nonelderly people."[10] Approximately 81% of workers are eligible to enroll in employer-sponsored insurance.[11]

---

[9] *See* Gary Claxton et al., *Health Policy 101: Employer-Sponsored Health Insurance*, KAISER FAMILY FOUND. (Apr. 15, 2026), at 1, available at https://www.kff.org/health-costs/health-policy-101-employer-sponsored-health-insurance/, archived at https://perma.cc/B83A-2BMN.

[10] *See Employer Health Benefits: 2024 Annual Survey*, KAISER FAMILY FOUND., available at https://files.kff.org/attachment/Employer-Health-Benefits-Survey-2024-Annual-Survey.pdf, at 64, archived at https://perma.cc/68QJ-4NEC.

[11] *Id.*

32.     A substantial majority (over 70%) of those workers enroll in such coverage:



*Figure 1* [12]

33.     Employment-based coverage is also the single largest source of private health insurance in the United States, with 2024 census data showing that approximately 53.8% of the total population is covered through an employer-sponsored plan.[13]

34.     Employer-sponsored health coverage is very often a significant component of employees' total compensation, with employer-provided benefits – particularly health insurance – constituting a large share of total compensation costs for employers.[14]

---

[12] *Id.* at 69.

[13] *Health Insurance Coverage in the United States: 2024*, U.S. CENSUS BUREAU, at 2, available at https://www2.census.gov/library/publications/2025/demo/p60-288.pdf, archived at https://perma.cc/Y9B3-XF6E.

[14] *See Employer Costs for Employee Compensation – December 2024*, U.S. BUREAU OF LABOR STATISTICS (Mar. 14, 2025), at 4, available at https://www.bls.gov/news.release/archives/ecec_03142025.pdf, archived at https://perma.cc/QHT6-L2FX.

35.     The cost of health coverage is shared between employers and employees, with employees contributing, on average, approximately 16% of premiums for employee-only coverage and approximately 25% of premiums for family coverage.[15]

36.     Employees contribute an average of approximately $1,368 annually for employee-only coverage and approximately $6,296 for family coverage.[16]

37.     Total premiums are much higher, averaging approximately $8,435 annually for employee-only coverage and approximately $23,968 for family coverage in 2023.[17]

38.     These costs have grown over time, with premiums for employer-sponsored coverage for a family increasing by approximately 24% over five years between 2019 and 2024 and increasing by approximately 52% since 2014.[18]

39.     More specifically, the average annual premium for single coverage has grown from $7,188 in 2019 to $8,951 in 2024, and the average annual premium for family coverage has grown from $20,576 in 2019 to $25,572 in 2024:

---

[15] *See Employer Health Benefits: 2024 Annual Survey*, KAISER FAMILY FOUND., at 9, available at https://files.kff.org/attachment/Employer-Health-Benefits-Survey-2024-Annual-Survey.pdf, archived at https://perma.cc/68QJ-4NEC.

[16] *Id.*

[17] *See Employer Health Benefits: 2023 Annual Survey*, KAISER FAMILY FOUND., at 7, available at https://files.kff.org/attachment/Employer-Health-Benefits-Survey-2023-Annual-Survey.pdf, archived at https://perma.cc/BFP4-GVQB.

[18] *Id.* at 41-42.



*Figure 2* [19]

40.     Employers generally provide health insurance in one of two ways. In a fully insured plan, the employer purchases insurance from an insurance company, which assumes responsibility for paying claims. In a self-funded plan, the employer pays claims itself and bears the financial risk of participant healthcare expenses.

41.     Health insurance costs for participants are commonly divided into four categories: payroll contributions, deductibles, copays, and coinsurance.

42.     Participants pay payroll contributions to enroll in coverage. They must also pay certain healthcare costs themselves through deductibles (i.e., the amount a participant must pay before a plan begins paying for most services), copays (i.e., a dollar amount paid for a particular healthcare service), and coinsurance (i.e., a percentage of healthcare costs paid by the participant) until the participant reaches the out-of-pocket maximum (i.e., the maximum amount

---

[19] *Id.* at 42.

a participant may pay for medical treatment during a year), after which the plan generally pays all covered costs for the remainder of the year.

43.     Even when a third-party processes claims, a self-funded employer remains responsible for selecting the health-plan options offered to employees and determining the cost-sharing terms of those options, including payroll contributions, deductibles, and out-of-pocket limits.

44.     Employees bear substantial out-of-pocket costs through deductibles, copayments, and coinsurance, with average deductibles for employee-only coverage in employer-sponsored plans exceeding $1,700.[20]

## II.     Employers' Selection of Healthcare Options Determines the Costs Employees Bear

45.     Employer-sponsored medical coverage is generally offered through ERISA "employee welfare benefit plans," including plans established or maintained by an employer to provide medical, surgical, or hospital benefits. 29 U.S.C. § 1002(1).

46.     Employers may select and offer different healthcare options, including health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs"), point-of-service plans ("POS Plans"), exclusive provider organizations ("EPOs"), and high-deductible options, each of which structures provider access and cost-sharing between employees and employers differently.

47.     HMOs usually limit coverage to specific doctors and hospitals that contract with the HMO, generally do not cover out-of-network care (other than emergency care), and may require a participant to live or work in a particular service area.[21]

---

[20] *Id.* at 6.
[21] *See Glossary: Health Maintenance Organization (HMO)*, HEALTHCARE.GOV, available at https://www.healthcare.gov/glossary/health-maintenance-organization-hmo/, archived at https://perma.cc/W9UB-

48.     By contrast, PPOs generally allow participants to use both in-network and out-of-network providers; however, participants usually pay less when they stay in-network and pay more when they receive out-of-network care.[22]

49.     Participants in different plan options pay different amounts for healthcare coverage, and plans may differ significantly in premiums, deductibles, copayments, and coinsurance.[23]

50.     Employer-sponsored plans commonly select and offer multiple coverage options that differ in various ways, including with respect to payroll contributions, deductibles, and out-of-pocket limits.[24]

51.     These options are typically presented as offering tradeoffs between higher payroll contributions with lower cost-sharing, on the one hand, and lower payroll contributions with higher cost-sharing exposure on the other.[25]

52.     Because employers choose plan healthcare options, employers are responsible for ensuring that all options are reasonable and do not needlessly require participants to pay excessive costs for healthcare.[26]

53.     It is especially important for employers to select reasonable healthcare options because employees frequently lack the resources, data, and/or ability to evaluate health insurance options.[27]

---

DY7A (defining HMOs as network-restricted plans); see *Glossary: Preferred Provider Organization (PPO)*, HEALTHCARE.GOV, available at https://www.healthcare.gov/glossary/preferred-provider-organization-ppo/, archived at https://perma.cc/Z3GK-WEH6 (describing broader provider access with differential cost-sharing).

[22] *Id.*

[23] *Id.*

[24] *See* Gary Claxton et al., *Health Policy 101: Employer-Sponsored Health Insurance*, KAISER FAMILY FOUND. (Apr. 15, 2026), available at https://www.kff.org/health-costs/health-policy-101-employer-sponsored-health-insurance/, archived at https://perma.cc/B83A-2BMN.

[25] *See id.*

[26] *See id.*

[27] *Id.*

54.     Empirical research shows that, when presented with the choice, employees can unwittingly select plan options that cost more overall despite the availability of lower-cost options.[28]

55.     A "dominated" health plan option is one that costs more, for the same coverage, than another available option regardless of how much a participant spends on healthcare.[29] In other words, a "dominated" option is one that requires a participant to pay more money for the same coverage that the participant would have paid if he or she had selected another available option. For such options, participants incur higher total healthcare costs regardless of how much they spend on healthcare.[30]

56.     Participants may select a more expensive option even when another available option would provide the same or better financial value. In one study of nearly 24,000 employees who were offered a selection of health-plan options, a majority (61%) selected "dominated" options.[31] The study concluded that such choices could not be explained by participants' risk preferences or expectations regarding their future healthcare needs.[32]

57.     ERISA places the responsibility for prudent option selection on fiduciaries, not on participants.[33] Participants often lack the information, time, and/or technical ability to accurately

---

[28] *See* Saurabh Bhargava, et al., *Do Individuals Make Sensible Health Insurance Decisions? Evidence from a Menu with Dominated Options*, NATIONAL BUREAU OF ECONOMIC RESEARCH, Working Paper No. 21160 (May 2015), at 2 ("the majority of employees chose plans that were financially dominated"), available at https://www.nber.org/system/files/working_papers/w21160/w21160.pdf, archived at https://perma.cc/6CC5-5FP8.

[29] *Id.*

[30] *See* Yanling Liu et al., *Dominated Options in Health Insurance Plans*, NATIONAL BUREAU OF ECONOMIC RESEARCH, Working Paper No. 24392 (Mar. 2018), available at https://www.nber.org/system/files/working_papers/w24392/w24392.pdf, at 4-5, archived at https://perma.cc/5RYX-LBSS.

[31] Saurabh Bhargava, George Loewenstein & Justin Sydnor, *Choose to Lose: Health Plan Choices from a Menu with Dominated Options*, 132 Q.J. Econ. 1319, 1321–23 (2017), available at https://www.cmu.edu/dietrich/sds/docs/loewenstein/ChoseLose.pdf, archived at https://perma.cc/7YF4-6HWB.

[32] *Id.*

[33] *See also* Ho et al., *The Impact of Consumer Inattention on Insurer Pricing in the Medicare Part D Program*, NATIONAL BUREAU OF ECONOMIC RESEARCH, Working Paper No. 21028 (Mar. 2015), at 2, 29 ("even attentive

analyze plan options. Plan sponsors and fiduciaries like Defendant, by contrast, possess the plan documents, data, claims experience, and modeling tools to evaluate whether options provide value to participants.[34]

58.     In evaluating plan options, employers can, and should, analyze a range of potential healthcare spending scenarios, including scenarios in which participants spend little on healthcare and scenarios in which participants spend significant amounts on healthcare.[35]

## III.     Department of Labor Guidance Governing Fiduciary Duties in Health Plans

59.     The Department of Labor ("DOL") has promulgated guidance clarifying that a fiduciary selecting a health-care arrangement must use an "objective" process designed to obtain the information necessary to evaluate the provider's qualifications, the quality of the services offered, and "the reasonableness of the fees charged in light of the services provided."[36]

60.     The DOL has further explained that the fiduciary's process must be structured to avoid "self-dealing, conflicts of interest or other improper influence," and that, regardless of the method used, the fiduciary "must be able to demonstrate compliance with ERISA's fiduciary standards."[37]

---

consumers do not make cost-minimizing choices"), available at https://www.nber.org/system/files/working_papers/w21028/revisions/w21028.rev0.pdf, archived at https://perma.cc/P8W3-3CQC.

[34] *See* P.A. Ubel et al., *Healthcare.gov 3.0—Behavioral Economics and Insurance Exchanges*, 372 N. ENGL. J. MED. 695, 697 (Feb. 19, 2015), available at https://business.columbia.edu/sites/default/files-efs/pubfiles/12765/Johnson_healthcare.gov.pdf, archived at https://perma.cc/PQG6-Z584.

[35] Amy B. Monahan & Barak D. Richman, *Hiding in Plain Sight: ERISA's Cure for the $1.4 Trillion Health Benefits Market*, 42 Yale J. on Regul. 234 (2025), available at https://www.yalejreg.com/wp-content/uploads/04.-Monahan-Richman-Article.-Print.pdf, archived at https://perma.cc/A26X-ZBTG (ERISA's duty of prudence applies to employer health-plan design and urging a data-driven fiduciary process for evaluating health plan options); U.S. DEP'T OF LABOR, *Field Assistance Bulletin No. 2002-03, Fiduciary Standards Under ERISA When Selecting and Monitoring Service Providers* (Nov. 5, 2002), available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2002-03, archived at https://perma.cc/BDH2-Q7VK (ERISA fiduciaries should employ an objective process to obtain and evaluate information necessary to make prudent fiduciary decisions).

[36] U.S. DEP'T OF LABOR, Information Letter to Diana O. Ceresi (Feb. 19, 1998), available at https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/information-letters/02-19-1998, archived at https://perma.cc/ML37-8D3F; *see also* 29 U.S.C. § 1104(a)(1)(B).

[37] *Id.*

61.     The DOL's guidance does not require a fiduciary to only search for the lowest price. Rather, the DOL recognizes that fiduciaries may consider multiple factors, but still must ensure that the compensation paid is *reasonable* in light of what its participants receive.[38]

62.     Under the DOL's guidance, "quality of services" is a relevant fiduciary consideration, and DOL has identified measures that a fiduciary may evaluate, including the scope and qualifications of available medical providers and specialists, ease of access to providers, ease of access to operational information, the timeliness of internal procedures for handling patient questions and complaints, the confidentiality of patient records, enrollee satisfaction statistics, and accreditation or ratings from independent entities or state agencies.[39]

63.     Additional DOL guidance repeats the same principle in the group-health-plan context: fiduciaries must act prudently, must act *solely* in the interest of participants and beneficiaries, and may pay only reasonable plan expenses.[40] The DOL has further explained that prudence is "one of a fiduciary's central responsibilities," that prudence "focuses on the process for making fiduciary decisions," and that fiduciaries therefore should document both their decisions and the basis for them.[41]

64.     The DOL's guidance also provides that, even where an employer uses outside professionals or internal committees, the employer remains responsible for the fiduciary functions it performs, including the prudent selection and monitoring of service providers and other arrangements affecting the plan.[42] Likewise, the DOL has advised that fiduciaries should

[38] *Id.*
[39] *Id.*
[40] *Understanding Your Fiduciary Responsibilities Under a Group Health Plan*, U.S. DEP'T OF LABOR (2023), available at https://www.dol.gov/node/63394, archived at https://perma.cc/8KVV-TLR2.
[41] *Id.*
[42] *Id.*

establish and follow a formal review process at reasonable intervals to determine whether existing arrangements should be continued or replaced.[43]

65.     Based on the DOL's guidance, therefore, a fiduciary must do more than offer participants a menu of options; a fiduciary must employ a prudent process that (i) tests whether participant costs are reasonable in relation to the value of the benefits offered by an option, (ii) monitors whether costs associated with an option remain reasonable over time, and (iii) removes options that impose participant costs that are excessive in relation to the value they provide.

## IV.     The Abbott Laboratories Health Care Plan

66.     The Plan is long-running[44] and provides welfare and other benefits for eligible personnel and retirees of Defendant as part of their overall compensation.

67.     The Plan is an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1). The Plan's EIN is 36-0698440.

68.     The Plan is self-funded through a combination of employer contributions and employee payroll deductions, with benefits paid from a trust established to cover the Plan's administrative expenses.[45]

69.     Accordingly, Defendant, *not* an insurer, funds claims and controls the Plan's benefit options, including premiums, deductibles, coinsurance, and out-of-pocket limits.

---

[43] *Meeting Your Fiduciary Responsibilities*, U.S. DEP'T OF LABOR (Sept. 2021), at 6, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities-booklet-2021.pdf, archived at https://perma.cc/7E4N-3THY.

[44] Other of Defendant's retirement or welfare plans date back to the 1950s and 1960s. Abbott Labs., Form S-8 (Sept. 29, 2003) (establishing plan effective July 9, 1951), available at https://www.abbottinvestor.com/static-files/f065b7b5-3b26-4046-b2d4-43b0a20c0f51, archived at https://perma.cc/Q4FG-SCWL; *Abbott Laboratories Supplemental Benefits Plans*, Exhibit 10.74 (Form 10-K) (Feb. 19, 2021), available at https://www.sec.gov/Archives/edgar/data/1800/000110465921025751/abt-20201231xex10d74.htm, archived at https://perma.cc/PLT8-UFYJ.

[45] Abbott Health Care Plan SPD at 2.

70. Because the Plan is self-funded, state insurance mandates generally do not regulate the Plan as insurance. Instead, ERISA governs the Plan under a federal framework. *See* 29 U.S.C. §§ 1144(a), (b)(2)(B).

71. DOL regulations make clear that amounts withheld from employee wages for contribution to a plan become plan assets as of the earliest date they can reasonably be segregated from the employer's general assets. *See* 29 C.F.R. § 2510.3–102(a)(1); *see also United States v. Whiting*, 471 F.3d 792, 799 (7th Cir. 2006) ("[W]e find that unremitted employee contributions, including employee contributions withheld from employee paychecks that have not been delivered to their intended benefit plans, can be plan assets[.]").

72. Both the Traditional PPO and the HIP PPO use a "preferred provider" network, which means that participants may obtain care from in-network providers at negotiated rates or from out-of-network providers at higher rates.[46]

73. The Traditional and HIP PPO cover inpatient and outpatient hospital care, physician services, diagnostic testing, preventive care, and specialty services such as rehabilitation and therapy.[47]

74. The Plan also offers participants a prescription drug benefit program, which has its own deductibles, coinsurance, and pharmacy network requirements. Coverage levels vary based on drug type (e.g., generic, preferred brand, non-preferred brand), and participants may incur additional costs when selecting higher-cost medications.[48]

---

[46] *See* "Medical coverage, levels and costs 2026" Abbott Labs., available at https://abbottbenefits.com/wp-content/uploads/BenefitsAtGlance_Medical_2026-1.pdf, archived at https://perma.cc/3A6B-H8XF.

[47] Abbott Health Care Plan SPD at 8–14.

[48] *Id.* at 15–16.

A.    The Plan's Offerings

75.    During the relevant time period, Defendant offered participants both the Traditional PPO and the HIP PPO options. Defendant also offered participants the Surest option, which is not relevant to this action.

76.    As reflected in the Plan's 2024 summary plan description, the Traditional PPO and HIP PPO options provide coverage for the same medical services and prescription drugs, including hospital care, physician services, emergency services, diagnostic testing, therapy services, maternity care, preventive care, telemedicine, and infertility treatment, as well as retail, mail-order, and specialty prescription drugs.[49]

77.    Both options cover the same physician and outpatient services, including primary care, specialist care, office visits, outpatient surgery, laboratory services, X-rays, MRI, CT, and PET imaging, diagnostic testing, infusion therapy, dialysis, chemotherapy, cardiac rehabilitation, occupational therapy, and physical medicine services.[50]

78.    Both options cover the same core hospital benefits, including inpatient hospital care, outpatient hospital care, ambulatory surgical facilities, physicians' and surgeons' services, emergency room care, extended care facilities, home health care, hospice care, ambulance services, and birthing centers.[51]

79.    Both options also cover the same major categories of preventive and specialty care, including maternity care, breast pumps, contraceptives, allergy testing, allergy injections, durable medical equipment, insulin pumps, hearing aids, orthotics, nutritional counseling, and behavioral health treatment.[52]

---

[49] *Id.* at 8–25.
[50] *Id.*
[51] *Id.*
[52] *Id.*

17

80.     Both plans further cover specialized services such as infertility services, chiropractic care, acupuncture, and other specialized medical benefits, with differences generally limited to the participant's cost-sharing obligations rather than whether the benefit exists.[53]

81.     In addition, the Traditional PPO and HIP PPO pay the same share of participant medical expenses. For participants in these options, the Plan typically pays 80% of in-network costs after the deductible is met. For out-of-network costs, the Plan typically pays 60% of costs after the deductible is met.[54]

B.     The Traditional PPO Is Virtually Always More Expensive Than the HIP PPO Across All Coverage Tiers and Spending Levels

82.     Both the Traditional PPO and the HIP PPO give participants access to the exact same nationwide provider network and cover the exact same medical services. The only difference between the options is how much participants ultimately pay for that coverage.

83.     Throughout the relevant class period, the Traditional PPO virtually always required substantially higher payroll contributions than the HIP PPO across every coverage tier.

84.     For example, for the 2026 plan year, both the Traditional PPO and the HIP PPO provided access to "the same" "network" and "services:"[55] The only difference between the options that Defendant identified was "in how – and how much – [participants] pay for coverage."

---

[53] *Id.*
[54] *Id.*
[55] The Surest option is not comparable to either the HIP PPO or Traditional PPO, because it does not involve a deductible or coinsurance. Because it involves fundamentally different costs, it is not the subject of Plaintiffs' claims.

## COMPARE THE PLANS

The national plans have the same great network and quality services. But there's a difference in how – and how much – you pay for coverage.

### ANNUAL EMPLOYEE PAYROLL CONTRIBUTIONS

| | HIP PPO | Traditional PPO | Surest |
|---|---|---|---|
| Employee* | $300 | $1,926 | $1,532 |
| Employee + Spouse/Domestic Partner* | $1,140 | $4,374 | $3,279 |
| Employee + Child(ren)* | $600 | $3,552 | $3,000 |
| Employee + Family* | $1,200 | $5,768 | $4,546 |

*Figure 3* [56]

85.     As shown in Figure 3, the HIP PPO and Traditional PPO required materially different employee payroll contributions across every type of coverage offered. For example, for employee-only coverage, a participant's annual contribution was $300 for the HIP PPO and $1,926 for the Traditional PPO.[57]

86.     For employee-plus-spouse or domestic-partner coverage, a participant's annual contribution was $1,140 for the HIP PPO and $4,374 for the Traditional PPO.[58]

87.     For employee-plus-child(ren) coverage, a participant's annual contribution was $600 for the HIP PPO and $3,552 for the Traditional PPO.[59]

---

[56] *Medical Plans Overview,* ABBOTT LABS., (accessed June 18, 2026), https://abbottbenefits.com/benefit/medical/, archived at https://perma.cc/BL9N-SRHP.
[57] *Id.*
[58] *Id.*
[59] *Id.*

19

88.     For employee-plus-family coverage, a participant's annual contribution was $1,200 for the HIP PPO and $5,768 for the Traditional PPO.[60]

89.     Thus, for every type of coverage, the Traditional PPO required substantially higher employee payroll contributions than the HIP PPO for access to "the same" network of providers and services.

90.     At *every* level of medical spending, the Traditional PPO costs participants more than the HIP PPO. The difference persists even after both options reach their out-of-pocket maximums because participants in the Traditional PPO pay much higher payroll contributions.

91.     Figure 4 shows how much a participant would pay under the Traditional PPO and the HIP PPO at different levels of medical spending, with a maximum total annual participant cost of $5,300 for the HIP PPO and $5,926 for the Traditional PPO. The horizontal axis shows the participant's annual medical expenses, and the vertical axis shows the participant's total annual cost under each plan, including payroll contributions, deductibles, and coinsurance.

92.     Figure 4 is illustrative as it does not include service-specific copayments because copays vary based on the number and type of medical services a participant receives. Although including copayments would change the dollar amounts shown, it would not alter the analysis or the overall relationship between the Traditional PPO's substantially higher payroll premiums and the two PPO options' deductibles, coinsurance, and out-of-pocket maximums across increasing levels of medical spending.

---

[60] *Id.*



*Figure 4[61]*

93.    Figure 4, created using Defendant's published 2026 plan terms, shows that the Traditional PPO costs more than the HIP PPO at every level of medical spending for the employee-only, in-network coverage tier. Although the Traditional PPO has a lower deductible and lower out-of-pocket maximum, those features do not make up for its much higher payroll contributions ($1,926 for the Traditional PPO versus $300 for the HIP PPO). As a result,

---

[61] The HIP PPO is consistently cheaper than the Traditional PPO. Although a computer simulation may run thousands of scenarios and find very unlikely circumstances in which the Traditional PPO results in lower participant costs, they do not change the conclusion that the Traditional PPO virtually always imposed substantially greater costs on participants while providing the same covered medical benefits.

participants paid more under the Traditional PPO when receiving the same covered medical services.

94.     The Traditional PPO was likewise more expensive than the HIP PPO for employees selecting "Employee + Children" coverage: at approximately $10,000 in medical spending, for example, a participant in the Traditional PPO would pay roughly $6,184 in total costs, compared to approximately $5,402 under the HIP PPO Plan. At approximately $25,000 in medical spending, the Traditional PPO would cost the participant approximately $9,169, while the HIP PPO Plan would cost the participant approximately $8,406.

95.     Likewise, the Traditional PPO is also more expensive than the HIP PPO for the "Employee + Spouse/Domestic Partner" coverage tier; and the Traditional PPO is more expensive at all levels of spending as compared to the HIP PPO in the "Family" coverage tier.

96.     Thus, the Traditional PPO was virtually always more expensive than the HIP PPO across coverage tiers. Participants enrolled in the Traditional PPO paid more for the same coverage and access to care than participants in the HIP PPO.

97.     Defendant nevertheless continued offering the Traditional PPO as a purportedly reasonable option without adequately disclosing that participants choosing that option would pay more than necessary, regardless of their level of medical spending.

98.     The Traditional PPO was also more expensive for participants who purchased prescription drugs because it treated prescription drugs separately from other medical expenses, requiring participants to satisfy an additional deductible and an additional out-of-pocket maximum for prescription-drug coverage.[62]

---

[62] *Id.*

99.     In contrast, under the HIP PPO, prescription-drug costs and medical costs were combined into a single deductible and out-of-pocket maximum, allowing participants who purchased prescription drugs to reach those limits while spending less overall.[63]

100.    In sum, the Traditional PPO cost participants more than the HIP PPO at every level of medical spending despite offering access to the same medical care and services. No prudent fiduciary would maintain an option that is virtually always worse for participants.

## DEFENDANT'S VIOLATIONS OF ERISA

### I.      ERISA's Fiduciary Duties

101.    Defendant's management of the Plan's health insurance options is governed by ERISA's fiduciary duties of loyalty and prudence. *See* 29 U.S.C. § 1104(a)(1)(A)–(B). These duties require fiduciaries to act "solely in the interest of the participants and beneficiaries" and with the "care, skill, prudence, and diligence" of a prudent fiduciary in similar circumstances. *Id.*

102.    Courts, including the Seventh Circuit, have repeatedly described these duties as "the highest known to the law." *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth,* 99 F.4th 928, 943 (7th Cir. 2024) (citation omitted); *see also Halperin v. Richards,* 7 F.4th 534, 546 (7th Cir. 2021) (quoting *Donovan v. Bierwirth,* 680 F.2d 263, 272 n.8 (2d Cir. 1982)). These duties apply to all aspects of plan administration, including the selection and ongoing management of plan options, and fiduciaries must always act with an "eye single to the interests of the participants and beneficiaries." *Halperin*, 7 F.4th at 546 (duties should apply to the exclusive purpose of providing benefits to participants) (citation omitted).

103.    As part of these obligations, ERISA fiduciaries have a duty to ensure that plan offerings are prudent and in the best interests of participants. This includes a continuing duty to

---

[63] *Id.*

23

monitor plan options and remove or correct those that are imprudent. *Hughes v. Northwestern Univ.*, 595 U.S. 170, 175–76 (2022); *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015) (both handled by undersigned counsel). A fiduciary cannot satisfy its duty of prudence by merely offering a menu of options if some of those options are predictably worse for participants. *Tibble*, 575 U.S. at 530. Offering plan options that are always more expensive than available alternatives – particularly where those options provide no countervailing benefit – falls short of this standard. *Id.*

104.    ERISA does not permit fiduciaries to avoid their responsibilities in this manner. *See Hughes*, 595 U.S. at 176 (fiduciary duties focus on the process and decisions of the fiduciary, not the choices of participants, as "[t]he Seventh Circuit erred in relying on the participants' ultimate choice over their investments to excuse allegedly imprudent decisions by respondents"). The duty of prudence requires fiduciaries to make sound decisions on behalf of participants, not to rely on participants to correct fiduciary failures. *Id.*

105.    Defendant acted imprudently by offering plan options that required higher participant spending without providing a corresponding benefit.

106.    A prudent fiduciary would have eliminated or repriced those options rather than continuing to offer participants a more expensive option with no benefit.

107.    ERISA fiduciaries also have an independent duty to disclose material information to participants. The Seventh Circuit has made clear that fiduciaries bear "an affirmative obligation to communicate material facts affecting the interests of beneficiaries." *Kenseth v. Dean Health Plan, Inc.,* 610 F.3d 452, 466 (7th Cir. 2010) (citation omitted).

108.    This duty extends beyond formal plan documents and includes any information that a reasonable participant would need to make an informed decision about plan benefits. *Id.*

24

109. Courts recognize that ERISA's standards are not measured by what a layperson might understand, but by what a knowledgeable fiduciary would do under similar circumstances. *See Chesemore v. All. Holdings, Inc.*, 886 F. Supp. 2d 1007, 1041–42 (W.D. Wis. 2012) ("ERISA fiduciaries [should] act in good faith as an objectively prudent fiduciary would act, not simply as a prudent layperson would act") (aff'd sub nom. *Chesemore v. Fenkell*, 829 F.3d 803 (7th Cir. 2016)).

## II.     Defendant Was a Fiduciary

110. Whether ERISA's fiduciary duties apply turns on the distinction between settlor and fiduciary functions. While an employer may act as a settlor when deciding whether to establish, amend, or terminate a plan, it acts as a fiduciary when exercising discretionary authority in administering the plan or implementing those decisions. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996); 29 U.S.C. § 1002(21)(A).

111. ERISA defines a fiduciary functionally. A person is a fiduciary "to the extent" he exercises discretionary authority over plan management, administration, or the disposition of plan assets. 29 U.S.C. § 1002(21)(A). This definition is not limited to named fiduciaries, but turns on conduct: "ERISA, however, defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (emphasis in original).

112. The selection and retention of plan investment or benefit options, once a plan is established, are fiduciary acts because they involve discretionary control over plan administration and participant choices. *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016) (ERISA fiduciaries must act with "care, skill, prudence, and diligence" when making plan-related decisions affecting participants, including "choosing wise investments and monitoring investments to remove imprudent ones.").

113. Consistent with this principle, the Department of Labor has explained that while plan design is a settlor function, activities undertaken to implement those decisions are distinct from settlor conduct. DOL Adv. Op. 2001-01A, 2001 ERISA LEXIS 4 (Jan. 18, 2001).

114. Here, Defendant exercised discretionary authority in determining which specific health plan options to offer to participants, and whether to continue offering them over time. Those are ongoing fiduciary judgments.

115. Even if the initial inclusion of a plan option could be characterized as a design choice, which it cannot, Defendant had an ongoing fiduciary obligation to review that option and remove it if it became imprudent relative to available alternatives.

116. Accordingly, Defendant acted as a fiduciary with respect to the selection, retention, and monitoring of the Plan's health insurance options, and its conduct is subject to ERISA's duties of prudence and loyalty.

### III. Defendant Breached Its Fiduciary Duties to Plan Participants

117. As a fiduciary, Defendant is required to ensure that costs incurred by participants are reasonable. *See Sweda v. Univ. of Penn.*, 923 F.3d 320, 328 (3d Cir. 2019) ("Fiduciaries must . . . understand and monitor plan expenses."); *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020) (discussing a fiduciary's duty to keep plan expenses under control); *see also* Restatement (Third) of Trusts § 88, cmt. a ("Implicit in a trustee's fiduciary duties is a duty to be cost-conscious."). "Wasting beneficiaries' money is imprudent." *Hughes v. Northwestern Univ.*, 63 F.4th 615, 627 (7th Cir. 2023) (internal quotation marks omitted).

118. Defendant is additionally duty bound to disclose material information to Plan participants. "Information is material if there is a substantial likelihood that nondisclosure 'would mislead a reasonable employee in the process of making an adequately informed decision regarding benefits to which she might be entitled.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d

26

585, 599 (8th Cir. 2009) (quoting *Kalda v. Sioux Valley Physician, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007)).

119. As the U.S. Supreme Court has explicitly held, a fiduciary is not allowed to use the terms of a plan document to shield itself from the consequences of an imprudent decision or the failure to monitor that decision: "[T]he duty of prudence trumps the instructions of a plan document." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014).

120. Defendant knew or should have known that participants who select the Traditional PPO pay more for the same services that are available under the HIP PPO, and that the Traditional PPO option was therefore an imprudent offering.

121. Defendant knew the economics of the two PPO options because Defendant selected and administered those options. The Plan documents identify Defendant as the Plan Administrator and fiduciary, and expressly state that, "The **employer** [Defendant] evaluates the costs of the **Plan** based on projected **Plan** expenses and determines the amount to be contributed by the **employer** and the amount to be contributed by the covered **employees** [i.e., participants]."[64] In other words, Defendant knows the employee paycheck contribution for each option, as well as the deductibles, the coinsurance rates, and the out-of-pocket limits.[65]

122. Defendant had more than enough information to determine whether the Traditional PPO's lower deductible was worth its higher required paycheck contributions. Any analysis would have shown that the Traditional PPO costs more at zero spending, more at moderate spending, and more at the out-of-pocket maximum.

---

[64] Abbott Laboratories Health Care Plan, Plan Document and Summary Plan Description, at 2.
[65] *Id.*

123. Having that information, Defendant could have removed the Traditional PPO or disclosed that Traditional PPO participants were paying more for the same covered medical treatment and provider access. Defendant did neither.

124. Defendant's own enrollment materials state that "over 95% of employees in the Traditional PPO actually would save money if enrolled in the HIP PPO," which is misleading – as virtually *all* participants enrolled in the Traditional PPO would save money if enrolled in the HIP PPO – and in any event confirms that the Traditional PPO is a vastly inferior option:

> **Which medical plan is right for you?**
> It depends on your needs. Over half of employees are in the HIP PPO, and we've found that over 95% of employees in the Traditional PPO actually would save money if enrolled in the HIP PPO.

*Figure 5[66]*

125. Despite this, Defendant presented the choice between the HIP PPO and Traditional PPO as dependent on participant "needs," and encouraged Plan participants to compare features such as premiums and deductibles, without disclosing that the Traditional PPO is more expensive for virtually *all* Plan participants.

126. In fact, Defendant had years of data demonstrating that the Traditional PPO is more expensive than the HIP PPO.

127. As early as 2017, when Defendant published its annual benefits guide, Defendant represented to participants that a significant majority of employees (i.e., over 90 percent) would spend less money overall by enrolling in the HIP PPO rather than the Traditional PPO.[67]

---

[66] *Abbott Laboratories, Benefits for My Life: Abbott's 2017 Benefits Highlights* (2017), at 5, available at https://cache.hacontent.com/ybr/R515/00472_ybr_ybrfndt/downloads/AbbottWhatsChanging.pdf, archived at https://perma.cc/CR8V-8ACB.
[67] *Id.*

128.     As indicated in Figure 6 below from the same benefits guide, Defendant was not just offering two PPO options. It had developed tools that projected employees' total expected costs under each option, meaning Defendant knew or had every reason to know that the Traditional PPO option was the more expensive option:

**WHAT'S THE RIGHT PLAN FOR YOU?**

Over 90 percent of Abbott employees would save money if enrolled in the Health Investment Plan. For help deciding which medical plan is the best choice, visit **www.abbottbenefits.com** and try the Health Care Cost Tool. You'll be able to model various health care cost scenarios and review cost and coverage data.

*Figure 6* [68]

129.     As a result, even based on its benefit guide that predates the class period by years, Defendant would have accumulated multiple years of data regarding the relative costs of the Traditional PPO and HIP PPO prior to the July 14, 2020, start of the class period.

130.     Defendant's use of cost-modeling tools as early as 2017 and representations about employee savings further demonstrate that it was actively evaluating and projecting cost differences between the Traditional PPO and HIP PPO.[69]

131.     Accordingly, by at least 2017, Defendant knew, or should have known, that the HIP PPO would produce lower overall costs.

132.     Additionally, because Defendant's Plan is self-funded, claims are paid from Plan assets. Accordingly, in the ordinary course of operating the Plan, Defendant received and maintained recurring data each year on enrollment, claims, and the costs associated with the Traditional PPO and HIP PPO.

---

[68] *Id.*
[69] *Id.*

29

133. By the start of the class period in 2020, Defendant had multiple years of that data and the ability to assess how the Traditional PPO and HIP PPO performed in practice. Continuing to offer the higher-cost Traditional PPO under these circumstances was imprudent.

134. According to Defendant's 2025 Benefits Highlights Guide, an excerpt of which is Figure 7 below, Defendant offered employees two PPO "national medical plans" that "mainly differ in how and when you pay for coverage—either at the time of service or through regular paycheck contributions."[70]

**MEDICAL PLANS**

Abbott offers two national medical plans.* They mainly differ in how and when you pay for coverage—either at the time of service or through regular paycheck contributions.

Each plan has its own network of providers, however, both plans cover the same services and include free preventive care.

**HEALTH INVESTMENT PLAN (HIP) PPO**

The HIP PPO has low paycheck contributions and a higher deductible. Features include access to more than 1,700 free preventive medications, and a Health Savings Account (HSA) that lets you contribute pre-tax dollars to cover healthcare expenses. Abbott also contributes to your HSA.

**TRADITIONAL PPO**

With the Traditional PPO, you have higher paycheck contributions, which you'll pay regardless of the amount of medical services you use. This plan includes a lower deductible and out-of-pocket costs.

**Both plans are available with the UnitedHealthcare (UHC) or BlueCross BlueShield (BCBS) network.**

\* Regional plans are available in California and Hawaii. For more information, access the Abbott Benefits Center via AbbottBenefits.com or speak to your recruiter.

**CARE COORDINATORS**

Available to national medical plan participants, the Care Coordinators are an expert team of nurses and benefit specialists who can assist with billing and benefit questions, finding network providers and reducing your out-of-pocket costs. Think of them as your health care "concierge desk," always ready to get you the help you need.

**DENTAL**

Abbott offers comprehensive coverage for dental expenses including exams, teeth cleaning, fillings, orthodontia and restorative services.

**VISION**

Abbott vision coverage includes exams, prescription lenses, frames, and contact lenses, plus discounts on certain services.

**RETIREE HEALTH INSURANCE**

Eligible employees who meet certain age and service requirements at retirement have access to retiree medical and life insurance. Retiree dental coverage is also available through MetLife.

**RX SAVINGS SOLUTIONS**

Alerts on money-saving opportunities for your prescriptions.

*Figure 7* [71]

135. Defendant further represented in its benefits materials that the available options "cover the same services and include free preventive care,"[72] while differing in cost structure, including paycheck contributions, deductibles, and out-of-pocket costs.

---

[70] *Id.*

[71] *Abbott Employee Benefits Highlights 2024,* ABBOTT LABS., https://cache.hacontent.com/ybr/R516/00472_ybr_ybrfndt/downloads/AbbottBenefitHighlightsGuide.pdf, archived at https://perma.cc/5NHY-GPZ9.

[72] *Id.*

136. Defendant described the HIP PPO as having "low paycheck contributions and a higher deductible."[73] Defendant further represented that the HIP PPO included access to more than 1,700 free preventive medications and an HSA to which Defendant itself contributed funds.

137. Defendant described the Traditional PPO as requiring "higher paycheck contributions," which participants would pay "regardless of the amount of medical services" they used.[74] Defendant further represented that the Traditional PPO included "a lower deductible and out-of-pocket costs."[75]

138. Defendant's benefits materials thus informed participants that the distinction between the HIP PPO and Traditional PPO was in the allocation and timing of participant costs – not the scope of covered medical services, which Defendant represented were the same under both options.

139. Defendant was aware, or should have been, based on the data it maintained, that employees selecting the Traditional PPO would incur higher medical costs irrespective of their medical spending.

**CLASS ACTION ALLEGATIONS**

140. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to seek the remedies provided by 29 U.S.C. § 1109(a). In addition, 29 U.S.C. § 1132(a)(3) authorizes any participant or beneficiary to bring suit for injunctive or other equitable relief.

---

[73] *Id.*
[74] *Id.*
[75] *Id.*

141.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of a putative class of the following similarly situated individuals (collectively, the "Class"):

> All full-time benefit-eligible employees of Defendant who, at any time on or after July 14, 2020 through the date of judgment, were enrolled in the Traditional Preferred Provider Organization option offered under the Abbott Laboratories Health Care Plan, and all beneficiaries covered through those participants. Excluded from the Class are Defendant, its directors and officers, any officers or employees of Defendant with responsibility for the Plan's administrative functions, their immediate family members, and any judicial officer presiding over this action.

142.    **Numerosity:** The Class includes thousands of people, such that it is not practicable to join all class members into one lawsuit.

143.    **Commonality:** Common questions of law and fact exist because Defendant offered a uniform Plan design and the same PPO options to all participants. Those questions include, but are not limited to:

a.  Whether Defendant is a fiduciary of the Plan, and the scope of its fiduciary duties;

b.  Whether Defendant knew or should have known that the Traditional PPO was imprudent, i.e., more expensive than the HIP PPO for the same covered medical treatment across coverage tiers and spending levels;

c.  Whether offering and maintaining an imprudent Traditional PPO breached Defendant's fiduciary duties;

d.  Whether Defendant failed to disclose that participants in the Traditional PPO would pay more for no added benefit;

e.  Whether that uniform omission caused participants to incur higher premiums, payroll contributions, and out-of-pocket costs;

f.  The proper measure of resulting plan-wide losses and equitable relief.

These issues arise from Defendant's centralized conduct and can be resolved on a class wide basis.

144. **Typicality:** Plaintiffs' claims are typical of the Class members' claims. Plaintiffs participated in the Plan, were current or former employees of Defendant, enrolled in the Traditional PPO option, and were subject to the same preferred provider organization options as other Class members. Defendant managed the Plan collectively and treated Plaintiffs consistently with other Class members. Defendant's imprudent actions and omissions affected all class members similarly.

145. **Adequacy of Named Representatives:** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

146. **Predominance:** The common questions of law and fact predominate over any individual issue that may arise on behalf of an individual Class member.

147. **Superiority:** A class action is the appropriate vehicle for fair and efficient adjudication of the claims of Plaintiffs and Class members because if individual actions were required to be brought by each member of the Class, the result would be a multiplicity of actions, creating hardship to the Class, to the Court, and to Defendant.

148. **Adequacy of Representation:** Plaintiffs and counsel will fairly and adequately protect the interests of Class members. Plaintiffs' counsel, Schlichter Bogard, will fairly and adequately represent the interests of the Class. Schlichter Bogard has a well-documented track record of successfully serving as class counsel in this Circuit and elsewhere. Schlichter Bogard's

33

pioneering work in class actions has been covered by numerous national publications, including the *New York Times* and *Wall Street Journal*, among other media outlets.

149.    Schlichter Bogard has also been widely recognized by federal judges across the United States as a pioneer in fiduciary breach class action litigation. *E.g., Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4 (S.D. Ill. July 17, 2015) (Schlichter Bogard is the "pioneer and the leader in the field[.]"). Before Schlichter Bogard filed the first cases in 2006, no law firm in the United States had ever filed such a case, and the Department of Labor, which regulates 401(k) plans, had never brought an excessive fee case.

150.    Schlichter Bogard handled the first full trial of such a case, resulting in a judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 45240 (W.D. Mo. Mar. 31, 2012), *aff'd in part, rev'd in part*, 746 F.3d 327 (8th Cir. 2014). Following remand, Judge Nanette Laughrey emphasized the significant contribution Schlichter Bogard made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

> Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.*, No. 06-4305, 2015 U.S. Dist. LEXIS 164818, at *7–8 (W.D. Mo. Dec. 9, 2015). Judge Laughrey also noted in that case, "[i]t is well established that complex ERISA litigation involves a national standard and special expertise. Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428,

34

at *9–10 (W.D. Mo. Nov. 2, 2012), *rev'd on other grounds*, 746 F.3d 327 (8th Cir. 2014) (citations omitted).

151. The Honorable George L. Russell, III noted that Schlichter Bogard's "work on behalf of participants in large 401(k) and 403(b) plans has significantly improved these plans, brought to light fiduciary misconduct that has detrimentally impacted the retirement savings of American workers, and dramatically brought down fees in defined contribution plans." *Kelly v. Johns Hopkins Univ.*, No. 16-2835, 2020 U.S. Dist. LEXIS 14772, at *4 (D. Md. Jan. 28, 2020). Judge Russell continued, "[w]ithout the unique and unparalleled foresight for this novel area of litigation by [Schlichter Bogard], the class would not have obtained any recovery for the alleged fiduciary breaches that affected the Johns Hopkins University 403(b) plan for years prior." *Id.* at *11.

152. In *Cates v. Trustees of Columbia University*, Judge George B. Daniels noted that Schlichter Bogard's "fee litigation and the Department of Labor's fee disclosure regulations approach $2.8 billion in annual savings for American workers and retirees." No. 16-06524, 2021 U.S. Dist. LEXIS 200890, at *15–16 (S.D.N.Y. Oct. 18, 2021) (citation omitted).

153. Schlichter Bogard's vast experience in this area is reflected by the firm's appointment as class counsel in 45 ERISA class actions involving claims of fiduciary breaches in large defined contribution and defined benefit plans.[76]

---

[76] *See, e.g., Berkelhammer v. ADP TotalSource Ret. Grp.*, No. 20-5696, ECF 270 (D.N.J. Feb. 13, 2025); *Harmon v. Shell Oil Co.*, No. 20-21, 2025 U.S. Dist. LEXIS 18545, at *5 (S.D. Tex. Feb. 3, 2025); *Schoen v. ATI, Inc.*, No. 24-01109, ECF 49 (W.D. Pa. Nov. 27, 2024); *Khan v. Bd. of Dirs. of Pentegra Defined Contribution Plan*, No. 20-07561, 2023 U.S. Dist. LEXIS 171827 (S.D.N.Y. Sep. 26, 2023); *Binder v. PPL Corp.*, No. 22-133, ECF 82 (E.D. Pa. Mar. 13, 2024); *Williams v. Centerra Group, LLC*, No. 20-4220, ECF 175 (D. S.C. June 20, 2023); *Ahmed et al. v. Liberty Mutual Group, Inc.*, No. 20-30056, ECF 73 (D. Mass. June 8, 2023); *Turner v. Schneider Elec. Holdings, Inc.*, No. 20-11006, ECF 212 (D. Mass. May 5, 2023); *Mills v. Molina Healthcare, Inc.*, No. 22-01813, 2023 U.S. Dist. LEXIS 211779, at *7 (C.D. Cal. Jan. 17, 2023); *Ford v. Takeda Pharms. U.S.A., Inc.*, No. 21-10090, ECF 101 (D. Mass. Nov. 21, 2022); *Wachala v. Astellas US LLC*, No. 20-3882, 2022 U.S. Dist. LEXIS 24052 (N.D. Ill. Feb. 10, 2022); *Lauderdale v. NFP Ret., Inc.*, No. 21-301, 2022 U.S. Dist. LEXIS 95857 (C.D. Cal. Feb. 16, 2022);

35

154. Schlichter Bogard has additionally handled, and repeatedly prevailed in, fiduciary breach class action litigation in the U.S. Supreme Court. For example, in *Tibble v. Edison International*, a landmark fiduciary breach class action handled by Schlichter Bogard, after a partial loss in the U.S. District Court for the Central District of California, which was upheld by the U.S. Court of Appeals for the Ninth Circuit, Schlichter Bogard achieved a reversal before the Supreme Court of the United States. The Supreme Court's vacatur in favor of the plaintiffs was unanimous. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823 (2015).

155. Schlichter Bogard secured a reversal of a dismissal before the U.S. Supreme Court, again in a unanimous decision, in *Hughes v. Northwestern University* – another fiduciary breach class action filed in this District. *See Hughes v. Nw. Univ.*, 595 U.S. 170 (2022).

156. In *Cunningham v. Cornell University*, yet another fiduciary breach class action, which was decided by the U.S. Supreme Court last year, Schlichter Bogard again achieved a

---

*Sweda v. Univ. of Pa.*, No. 16-4329, 2021 U.S. Dist. LEXIS 121336 (E.D. Pa. June 28, 2021); *Pledger v. Reliance Trust Co.*, No. 15-04444, 2020 U.S. Dist. LEXIS 25548, at *4 (reaffirming appointment); *Munro v. Univ. of S. Cal.*, No. 16-6191, 2019 U.S. Dist. LEXIS 226682 (C.D. Cal. Dec. 20, 2019); *Vellali v. Yale Univ.*, 333 F.R.D. 10 (D. Conn. 2019); *Kelly v. The Johns Hopkins Univ.*, No. 16-2835, ECF 87 (D. Md. Aug. 16, 2019); *Bell v. Pension Comm. of ATH Holding Co., LLC*, No. 15-2062, 2019 U.S. Dist. LEXIS 11369 (S.D. Ind. Jan. 24, 2019); *Cunningham v. Cornell Univ.*, No. 16-6525, 2019 U.S. Dist. LEXIS 10357 (S.D.N.Y. Jan. 22, 2019); *Cassell v. Vanderbilt Univ.*, No. 16-2086, 2018 U.S. Dist. LEXIS 181850 (M.D. Tenn. Oct. 23, 2018); *Cates v. Trs. of Columbia Univ.*, No. 16-6524, ECF 218 (S.D.N.Y. Nov. 15, 2018); *Henderson v. Emory Univ.*, No. 16-2920, 2018 U.S. Dist. LEXIS 180349 (N.D. Ga. Sept. 13, 2018); *Tracey v. MIT*, No. 16-11620, 2018 U.S. Dist. LEXIS 179945 (D. Mass. Oct. 19, 2018); *Ramsey v. Philips N. Am.*, No. 18-1099, ECF 19 (S.D. Ill. June 12, 2018); *Sacerdote v. N.Y. Univ.*, No. 16-6284, 2018 U.S. Dist. LEXIS 23540 (S.D.N.Y. Feb. 13, 2018); *Clark v. Duke Univ.*, No. 16-1044, 2018 U.S. Dist. LEXIS 62532 (M.D.N.C. Apr. 13, 2018); *Ramos v. Banner Health*, 325 F.R.D. 382 (D. Colo. 2018); *Troudt v. Oracle Corp.*, 325 F.R.D. 373 (D. Colo. 2018); *Pledger v. Reliance Tr. Co.*, 325 F.R.D. 373 (N.D. Ga. 2017); *Marshall v. Northrop Grumman Corp.*, No. 16-6794, 2017 U.S. Dist. LEXIS 222531 (C.D. Cal. Nov. 2, 2017); *Sims v. BB&T Corp.*, No. 15-732, 2017 U.S. Dist. LEXIS 137738, at *20 (M.D.N.C. Aug. 28, 2017); *Gordan v. Mass. Mutual Life Ins. Co.*, No. 13-30184, ECF 112 (D. Mass. June 22, 2016); *Kruger v. Novant Health*, No. 14-208, ECF 53 (M.D.N.C. May 17, 2016); *Kreuger v. Ameriprise Fin., Inc.*, 304 F.R.D. 559, 574 (D. Minn. 2014); *Abbott v. Lockheed Martin*, No. 06-701, ECF 403 (S.D. Ill. Aug. 1, 2014); *Spano v. Boeing Co.*, 294 F.R.D. 114 (S.D. Ill. 2013); *Beesley v. Int'l Paper Co.*, No. 06-703, ECF 542 (S.D. Ill. Oct. 10, 2013); *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S. Dist. LEXIS 101165, at *6–7 (C.D. Ill. July 3, 2013); *Will v. Gen. Dynamics*, No. 06-698, 2010 U.S. Dist. LEXIS 95630, at *5–6 (S.D. Ill. Aug. 9, 2010); *Martin v. Caterpillar Inc.*, No. 07-1009, ECF 173 (C.D. Ill. Apr. 21, 2010); *Tibble v. Edison Int'l*, No. 07-5359, 2009 U.S. Dist. LEXIS 120939, at *20, 29 (C.D. Cal. June 30, 2009); *George v. Kraft Foods Global Inc.*, 251 F.R.D. 338 (N.D. Ill. 2008); *Taylor v. United Techs. Corp.*, No. 06-1494, 2008 U.S. Dist. LEXIS 43655 (D. Conn. June 3, 2008); *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102 (N.D. Cal. 2008); *Tussey v. ABB, Inc.*, No. 06-4305, 2007 U.S. Dist. LEXIS 88668 (W.D. Mo. Dec. 3, 2007); *Loomis v. Exelon Corp.*, No. 06-4900, 2007 U.S. Dist. LEXIS 46893 (N.D. Ill. June 26, 2007).

unanimous victory. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 695, 145 S. Ct. 1020, 1024 (2025).

157.     Other courts, particularly in the Seventh Circuit, have repeatedly heralded Schlichter Bogard's work in class action litigation. By way of limited example:

158.     Judge Tanya Walton Pratt of the Southern District of Indiana recognized Schlichter Bogard's "extraordinary skill and determination" in securing a $23.65 million monetary recovery and over $62 million in total value for plan participants. *See Bell v. Pension Comm. of ATH Holding Co., LLC*, No. 15-2062-TWP-MPB (S.D. Ind. Sep. 14, 2019), Doc. No. 380. The court praised the firm for its role as "private attorney general risking large sums of money and investing thousands of hours for the benefit of employees and retirees." *Id.* at 3. Notably, only one objection was received from a class of over 127,000 members, which was a "remarkable sign of the Class's overwhelming support." *Id.* at 2.

159.     Another U.S. district judge found as follows: "Class Counsel performed substantial work . . . investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the [class]." *Will v. General Dynamics*, No. 06-698, 2010 U.S. Dist. LEXIS 123349, at *8–9 (S.D. Ill. Nov. 22, 2010).

160.     Other findings by U.S. district judges in relation to Schlichter Bogard's work include the following: "Schlichter, Bogard [] has achieved unparalleled results on behalf of its clients, . . . has invested . . . massive resources and persevered in the face of . . . enormous risks[.]" *Nolte v. Cigna*, No. 07-2046, 2013 U.S. Dist. LEXIS 184622, at *8 (C.D. Ill. Oct. 15, 2013) (obtaining recovery of $35 million on behalf of plan participants in Cigna's 401(k) plan).

37

161. "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S. Dist. LEXIS 12037, at *8 (S.D. Ill. Jan. 31, 2014).

162. "Schlichter, Bogard [] demonstrated extraordinary skill and determination in obtaining this result for the Class." *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *9 (S.D. Ill. July 17, 2015).

163. In many of these cases, settlements were reached only after years of litigation and after Schlichter Bogard conducted extensive discovery, defeated motions to dismiss and for summary judgment, obtained class certification, and, in some, handled one or more interlocutory appeals. Examples, in addition to the 12-year history of *Tussey v. ABB*, *supra*, and nearly 14-year history of *Tibble v. Edison International*, *supra*, include *Abbott v. Lockheed Martin Corp.*, No. 06-701 (S.D. Ill.) (eight years of litigation including a Seventh Circuit appeal). ERISA fiduciary breach class actions involve tremendous risk and require review and analysis of thousands of documents, finding and obtaining opinions from expensive, unconflicted, consulting and testifying national experts in finance, fiduciary practices, and related fields, and are extremely hard-fought and well-defended.

164. A law firm that brings a putative class action such as this must be prepared to finance the case for years through a trial and appeals, all at substantial expense. For example, in *Tussey v. ABB*, *supra*, seven experts testified at trial, and the two defendant groups therein had 15 or more lawyers present in the courtroom throughout the month-long trial. In addition, all parties, including plaintiffs, had a technology team present throughout. Schlichter Bogard expended over $2,000,000 out-of-pocket by the conclusion of the trial and carried the expense

without reimbursement for more than twelve years. That case continued after being tried with two appeals to the Eighth Circuit, and multiple remands to the district court.

**CAUSES OF ACTION**

**COUNT I – BREACH OF FIDUCIARY DUTY FOR SELECTING AND RETAINING AN IMPRUDENT OPTION (29 U.S.C. § 1104(A)(1))**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

165. Plaintiffs repeat and re-allege Paragraphs 1 through 164 of the Complaint as though fully set forth herein.

166. Defendant is a fiduciary of the Plan under 29 U.S.C. § 1002(21).

167. ERISA required Defendant to act prudently and solely in participants' interests when selecting, monitoring, and maintaining the Plan's PPO options. That duty includes ensuring that no option is virtually always inferior to another and removing options that impose higher costs without added value.

168. Defendant breached that duty by offering and maintaining the Traditional PPO alongside the HIP PPO even though the Traditional PPO consistently produced, and produces, higher total annual costs across all coverage tiers and all levels of medical spending, while offering the same covered medical treatment and provider access.

169. In other words, participants in the Traditional PPO pay more for the same care.

170. A prudent fiduciary would not offer or retain an option that is worse on cost with no offsetting benefit.

171. A prudent fiduciary would have identified this imprudence through comparisons of premiums, deductibles, coinsurance, and out-of-pocket limits, and would have eliminated or corrected the imprudent option.

172. Defendant breached those duties by retaining and presenting the Traditional PPO despite knowing, or having enough information to know, that the Traditional PPO imposed materially higher participant costs than the HIP PPO without commensurate additional value.

173. Defendant nevertheless continued to offer the Traditional PPO and failed to correct or remove it. Defendant thereby shifted to participants the burden of identifying and avoiding an imprudent option that Defendant itself had the information and fiduciary obligation to evaluate.

174. Defendant also breached its duty of loyalty by retaining and presenting an option that caused participants to pay excess costs for no commensurate participant benefit.

175. Defendant's conduct was not solely in the interest of participants and beneficiaries.

176. Because that failure caused Traditional PPO participants to incur higher total healthcare costs without any benefit, Defendant is liable to restore those losses and provide appropriate equitable relief under ERISA. See 29 U.S.C. §§ 1109(a), 1132(a)(2)–(3).

## COUNT II – BREACH OF FIDUCIARY DUTY – FAILURE TO PROVIDE MATERIAL FACTS (29 U.S.C. § 1104(A)(1))
### (ON BEHALF OF PLAINTIFFS AND THE CLASS)

177. Plaintiffs repeat and re-allege Paragraphs 1 through 164 of the Complaint as though fully set forth herein.

178. Defendant is a fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21)(A) and is required to act with prudence and loyalty under 29 U.S.C. § 1104(a)(1), including a duty to disclose material information where silence would mislead participants or cause harm.

179. Defendant breached that duty by failing to disclose that the Traditional PPO was imprudent relative to the HIP PPO because employee participants in the Traditional PPO paid higher premiums and total out-of-pocket costs for the same covered medical treatment and provider access.

180. Defendant knew or should have known, based on its own plan data and cost comparisons of premiums, deductibles, coinsurance, and out-of-pocket limits, that the Traditional PPO consistently resulted in higher total annual costs across coverage tiers and spending levels, yet failed to inform participants that they were paying more for no added benefit.

181. Defendant's enrollment materials did not clearly disclose that the Traditional PPO was more expensive across virtually all spending levels and that Traditional PPO participants would save money by enrolling in the HIP PPO. Instead, Defendant suggested that participants could select between the Traditional PPO and HIP PPO based on their individual circumstances and preferences.

182. This omission was material, because a reasonable participant would view the fact that one option is more expensive than another offering the same benefits as critical to his or her selection.

183. By withholding this information, Defendant caused participants to enroll in and remain in an imprudent option, resulting in excess payroll contributions, higher healthcare costs, and lost wages.

184. As a result of these breaches, the Plan and its participants suffered significant losses. Defendant is liable to make the Plan whole and to provide appropriate equitable relief under ERISA. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2)–(3).

**COUNT III – BREACH OF FIDUCIARY DUTY – FAILURE TO MONITOR
FIDUCIARIES (29 C.F.R. § 2509.75-8, FR-17)
(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

185.    Plaintiffs repeat and re-allege Paragraphs 1 through 164 of the Complaint as though fully set forth herein.

186.    Defendant was the Plan Administrator, named fiduciary, and appointing fiduciary for the Plan.

187.    Defendant appointed, retained, or delegated fiduciary responsibilities to the Corporate Benefits Department, the Divisional Vice President of Compensation and Benefits, claims administrators, service providers, and other fiduciaries responsible for administering and monitoring the Plan's medical options.

188.    Defendant had a continuing duty to monitor those appointed fiduciaries at reasonable intervals, to ensure that they were performing their duties in compliance with ERISA, the Plan documents, and the interests of participants and beneficiaries. *Howell v. Motorola*, 633 F.3d 552, 573 (7th Cir. 2011) ("There is no doubt that those who appoint plan administrators have an ongoing fiduciary duty under ERISA to monitor the activities of their appointees.") (citing 29 C.F.R. § 2509.75-8 at FR-17).

189.    Defendant breached that duty by failing to monitor whether its appointed fiduciaries used a prudent process to evaluate the Traditional PPO, compare it against the HIP PPO, review participant cost data, and correct or remove an option that imposed materially higher participant costs without corresponding financial value.

190.    Had Defendant prudently monitored its appointed fiduciaries, it would have discovered that they failed to correct the Traditional PPO's higher costs despite years of enrollment, claims, contribution, and cost-modeling data.

42

191. Defendant further breached its monitoring duty by failing to remove or replace those fiduciaries, failing to require a prudent review process, and failing to ensure that corrective action was taken.

192. As a direct result of Defendant's failure to monitor appointed fiduciaries, the Plan and its participants suffered losses.

## PRAYER FOR RELIEF

193. WHEREFORE, Plaintiffs, as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

a. A determination that this action may proceed as a class action under Rule 23(b)(1),

b. or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

c. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

d. A declaration that Defendant has breached its fiduciary duties under ERISA;

e. An order compelling Defendant to personally make good to the Plan and its participants all losses incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to its position but for this unlawful conduct;

f. Surcharge and other equitable relief to redress Defendant's illegal practices and to enforce the provisions of ERISA as may be appropriate;

g. An order enjoining Defendant from any further violations of its ERISA fiduciary responsibilities, obligations, and duties;

h. An award of prejudgment interest;

i.   An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the

common fund doctrine; and

j.   An award of such other and further relief as the Court deems equitable and just.

Dated: July 14, 2026                          Respectfully submitted,

                                              s/ Andrew D. Schlichter
                                              Andrew D. Schlichter
                                              Troy A. Doles
                                              Alexander L. Braitberg
                                              Chen Kasher
                                              SCHLICHTER BOGARD LLC
                                              100 South Fourth Street, Suite 1200
                                              St. Louis, MO 63102
                                              Tel.: (314) 621-6115 / Fax: (314) 621-5934
                                              aschlichter@uselaws.com
                                              tdoles@uselaws.com
                                              abraitberg@uselaws.com
                                              ckasher@uselaws.com

                                              Ruben R. Chapa
                                              SCHLICHTER BOGARD LLC
                                              33 North Dearborn, Ste. 1170
                                              Chicago, IL 60602
                                              Tel.: (630) 919-9301 / Fax: (314) 621-5934
                                              rchapa@uselaws.com

                                              *Attorneys for Plaintiffs*